# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GREGORY J. GARBINSKI, | : |
|     PLAINTIFF, | : |
| | :   CIVIL ACTION NO. 3:10cv1191(VLB) |
| | : |
|     v. | :   JULY 26, 2011 |
| | : |
| NATIONWIDE MUTUAL INSURANCE | : |
| COMPANY, et al., | : |
|     DEFENDANTS. | : |

## MEMORANDUM OF DECISION GRANTING DEFENDANT NATIONWIDE SECURITIES LLC'S [DOC. #17] MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS AND COMPEL ARBITRATION AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' [Doc. #19] MOTION TO DISMISS

The Plaintiff, Gregory J. Garbinski ("Garbinski"), brings this action alleging in count one breach of contract of an Independent Contractors Agent's Agreement (the "Agent Agreement") and in count two breach of contract of a Sales Representative Agreement (the "Securities Agreement"). In addition, Plaintiff further asserts causes of action for violations of Connecticut's Franchise Act (the "Franchise Act"), Conn. Gen. Stat. § 42-133 (e)-(g); the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b; interference with business expectancy; negligent misrepresentation; and intentional misrepresentation (Counts 3-7, respectively). Defendant Nationwide Securities, LLC has moved to dismiss the proceedings pursuant to a mandatory arbitration provision in the Securities Agreement under Fed. R. Civ. P. 12(b)(1) or in the alternative to stay the proceedings and compel arbitration. [Doc. # 17]. All of the Defendants have moved to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). [Doc. # 19].

<u>Factual Background and Plaintiff's Allegations</u>

The following facts are taken from Plaintiff's complaint. Garbinski was an insurance agent who represented Defendants from January 1, 2003 until April 9, 2009 pursuant to the Agent Agreement and the Securities Agreement. Defendants Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Assurance Company of Florida, Colonial County Mutual Insurance Company, and Nationwide Lloyds were party to the Agent Agreement with Garbinski. The Agent Agreement became effective January 1, 2003 and provided that either party could cancel the agreement at any time, with or without cause. [Doc. # 1, Ex. A]. Defendant Nationwide Securities Inc. was party to the Securities Agreement with Garbinski. The Securities Agreement was entered into by the parties on or about February 12, 2004 and contained a mandatory arbitration provision. [Doc. # 1, Ex. B]. On April 9, 2009, Defendants cancelled Garbinski's appointment to act as their insurance agent and cancelled the Agent and Securities Agreements. [Doc. # 1].

Plaintiff alleges in count one that Defendants breached the Agent Agreement when they failed to perform certain acts triggered by their cancellation of the agreement on April 9, 2009. Specifically, the Plaintiff argues that Defendants breached the Agent Agreement by failing to pay both Extended Earnings due pursuant to Paragraph 12(b) and 12(d)(3) of the Agent Agreement and automobile loan and credit card amounts "due to Defendants" pursuant to

paragraph 12 (d) which resulted in the accrual of additional interest and the assertion of loan and/or credit card defaults and repossession threats from Defendants to Plaintiff. [Doc. # 1]. Plaintiff also argues that under the Agent Agreement, Defendants were obligated to comply with the terms of the Nationwide Agency Administration Handbook (the "Handbook") with regard to cancellation under Sections 3 and 4 and therefore breached the Agent Agreement by failing to provide Plaintiff with an opportunity to be heard before an Agent Review Board as provided in the Handbook. [*Id.* and Doc. # 1, Ex. A]. In addition, Plaintiff argues Defendants breached the terms of the Handbook and the Agent Agreement by failing to pay Plaintiff's valid disability claim. [*Id.*]. Lastly, Plaintiff asserts that Defendants breached the Agent Agreement by failing to provide him with paycheck and commission statements and failed to permit Plaintiff to convert various group insurance benefits for himself and his family upon cancellation of the agreement. [*Id.*].

In count two, Plaintiff alleges a breach of the Securities Agreement based on Defendant Nationwide Securities, Inc.'s issuance of a Form U-5 to the Financial Industry Regulatory Authority ("FINRA") falsely notifying them that the Plaintiff had been charged with the commission of a felony and terminated the Securities Agreement based on the felony charge. [Doc. # 1]. Plaintiff alleges that he has not been charged with any felony. Plaintiff further argues that Defendant breached the Securities Agreement by foregoing the proper notification procedures by failing to comply the rules and regulations of the Handbook. [*Id.*].

In count three, Plaintiff alleges that Defendants violated Connecticut's Franchise Act. Conn. Gen. Stat. § 42-133 (e)-(g); [Doc. # 1]. Plaintiff argues that pursuant to the Agent and Securities Agreements that Plaintiff was a "franchisee" under terms of the statute and accordingly Plaintiff is entitled to the protections of the Franchise Act and that Defendants violated the act by not complying with the act's provisions regarding notice and good cause for termination and/or cancellation. In count four, Plaintiff alleges that Defendants likewise violated the Connecticut Unfair Trade Practices Act ("CUTPA"). Conn. Gen. Stat. § 42-110b; [*Id*.].

In count five, Plaintiff argues that Defendants interfered with his business expectancy, as pursuant to the terms of the Agent and Securities Agreements the Plaintiff "had an expectation that he would continue to earn premiums and/or commission from the issuance of insurance or securities products as well as the maintenance and/or renewal of already existing insurance policies or securities products to customers of the Plaintiff." [Doc. # 1]. In particular, Plaintiff argues that Defendant interfered with his business expectancy by improperly terminating the Agent and Securities Agreements. [*Id*.].

In counts six and seven, Plaintiff argues that Defendant Nationwide Securities Inc. is liable for negligent and intentional misrepresentation based on its purported false report to FINRA that Plaintiff had been charged with a felony. [Doc. # 1].

**Legal Standard**

The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are "substantively identical."  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d. Cir. 2003).  However, on a motion to dismiss under Rule 12(b)(1), the party invoking the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6).  *Id.*  In deciding both types of motions, the Court "must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *In re AIG Advisor Group Sec. Litig.*, 309 Fed. App'x. 495, 497 (2d Cir. 2009).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

The Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  In addition, the Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in

bringing suit." *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Here, Plaintiff has attached the Agent and Securities Agreements to the Complaint and therefore the Court may consider these two agreements on Defendants' motions to dismiss. The Plaintiff has not, however, attached the Handbook to his complaint and the Handbook has not been otherwise made a part of the record for consideration. In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), however, the Court "may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007).

### Analysis of Defendant Nationwide Securities, Inc's Motion to Dismiss

Defendant Nationwide Securities, LLC has moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) or in the alternative to stay the proceedings and compel arbitration based on the mandatory arbitration provision in the Securities Agreement. The Securities Agreement provides in relevant part:

> **Mandatory Arbitration. To the extent permissible under the NASD[1] Code of Arbitration Procedure, NSI and Representative mutually consent to the resolution by NASD arbitration of any and all disputes, claims or controversies, whether or not arising out of Representative's status as a representative or termination as a representative, that NSI may have against Representative or that Representative may have against NSI, including its officers, directors, employees, and representatives in the capacity of its employees. [Doc. # 1, Ex. B].**

---

[1] **In July 2007, the National Association of Securities Dealers ("NASD") merged into and became FINRA. [Doc. # 18].**

Under the Federal Arbitration Act ("FAA"), written agreements to arbitrate "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract … A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition … for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. §§2, 4.  This Court has concluded that the  FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitrate on issues as to which an arbitration agreement has been signed."  *Pomposi v. Gamestop, Inc.*, No. 3:09-cv-340, 2010 WL 147196, at *3 (D. Conn. Jan. 11, 2010) (citations omitted).  "The FAA embodies the 'liberal federal policy favoring arbitration agreements' and 'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

Pursuant to the FAA, "the role of courts [in the present context] is limited to determining two issues: (i) whether a valid agreement or obligation to arbitrate exists, and (ii) whether one party to the agreement has failed, neglected or refused to arbitrate." *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (internal quotation marks and citation omitted).  In this case, it is undisputed that there is a valid agreement to arbitrate the claims under the

Securities Agreement and it is also undisputed that Plaintiff has failed to arbitrate in contravention of the terms of the agreement.

Further, Plaintiff in his opposition to Defendant Nationwide Securities, Inc.'s motion to dismiss concedes that there was a valid agreement to arbitrate and requests the Court to not outright dismiss the action but instead stay the proceedings "so that Plaintiff can immediately commence arbitration proceedings before FINRA … [s]ince any arbitration award will require confirmation as a judgment of this Court for enforcement purposes, it serves judicial economy to stay the proceedings rather than dismiss the Plaintiff's Complaint." [Doc. #33]. The Court declines Plaintiff's motion to stay as it does not serve judicial economy to maintain inactive causes of action in its docket and grants Defendant Nationwide Securities, Inc.'s motion to dismiss Plaintiff's causes of action based on the Securities Agreement and the conduct of Defendant Nationwide Securities, Inc. without prejudice to either Parties' right to open the case solely to appeal or enforce the arbitral decision. The Court further orders that those causes of action which are based on the Securities Agreement and the conduct of Defendant Nationwide Securities, Inc. proceed to arbitration.

Accordingly, Plaintiff's claims in counts two, six and seven are hereby dismissed as those claims solely relate to conduct that is subject to the mandatory arbitration provision in the Securities Agreement. To the extent that Plaintiff's claims in counts three, four and five are based on the Securities Agreement, those claims are also dismissed. The Court will only consider

Plaintiff's claims in counts three, four and five to the extent they are based on the Agent Agreement, which is not subject to an arbitration clause.

<u>Analysis of Breach of Contract Claim</u>

As noted above, Plaintiff's claim for breach of the Securities Agreement in count two has been dismissed as it is subject to mandatory arbitration. Accordingly, the Court will only examine Plaintiff's claim for breach of the Agent Agreement in count one.   Under Connecticut law, the elements of a breach of contract action are (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages.  *Empower Health LLC v. Providence Health Solutions LLC*, No. 3:10-cv-1163, 2011 WL 2194071, at *4 (D. Conn. June 3, 2011) (citation omitted).   "It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were."  *Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 225 (2009).   "[T]he interpretation and construction of a written contract present only questions of law, within the province of the court ... so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission System*, *L.P.*, 252 Conn. 479, 495 (2000) (*quoting* 11 S. Williston, *Contracts* § 30.6 (4th ed. 1999)). "Contract language is unambiguous when it has a definite and precise meaning ... concerning which there is no

reasonable basis for a difference of opinion." *Levine v. Advest, Inc.*, 244 Conn. 732, 746 (1998) (internal citations and quotations omitted).

> **i.** **Analysis Breach of Contract Claim Against Individual Defendants**

Defendants move to dismiss the breach of contract claim against four employees of Defendants: Frederick W. Owers, Cynthia Tolsma, George Robinson, Jr., and Christopher Kelly (the "Individual Defendants") as these individuals were neither parties nor personally bound by the Agent Agreement. The Court agrees that it is axiomatic that one cannot be liable for breach of contract unless one is a party to that contract. *Chardavoyne v. Thames Water Holdings, Inc.*, No. 3:03cv56, 2007 WL 735707, at *4 (D. Conn. Mar. 5, 2007). An individual may be liable for the acts and omission of a corporation if the corporate veil is pierced. *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.*, 187 Conn. 544, 554 (1982); *Messina v. FTF Crawlspace Specialists, Inc.*, No.CV10085715S, 204 WL 3105926, at *2 (Conn. Super. Dec. 8, 2004). The Plaintiff does not allege facts in his Complaint, nor does he argue in his objection to the motion to dismiss, the existence of facts which would support a claim that the corporate defendants' veil should be pierced. Accordingly, since the contractual relationship is between the Defendant corporate entities and not the Individual Defendants, Plaintiff's pure breach of contract claims cannot be maintained against the Individual Defendants.

> **ii.** **Analysis of Breach of Contract Claim Based on Failure to Comply With Defendants' Nationwide Agency Administration Handbook**

Defendants move to dismiss Plaintiff's allegations on the basis that the Agent Agreement unambiguously provided that the contract was terminable at any time with or without cause. Plaintiff argues that under the Agent Agreement Defendants are obligated to comply with Defendants' Handbook and reason that since Defendants did not comply with the terms of the Handbook by not providing Plaintiff with an opportunity to be heard before an Agent Review Board prior to cancelling the Agent Agreement or paying Plaintiff's valid disability claim, Defendants also breached the Agent Agreement. The Court notes that Plaintiff also claims that Defendants' obligation to pay the disability claim also arises under the terms of the Agent Agreement itself in addition to the Handbook. Defendants assert that Plaintiff cannot use the terms of the Handbook to alter the terms of the Agent Agreement which clearly provides for termination at will and without cause. While the Plaintiff may seek to so do, the Court notes that Paragraph 10 of the Agent Agreement states that:

> This Agreement shall automatically cancel upon the date of your license to act as an agent for the Companies is revoked or cancelled or upon death. Further, due to the personal nature of our relationship, you or the Companies have the right to cancel this Agreement at any time with or without cause after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agent shall have access to the Agent Administrative Review Board, and its procedures, in accordance with the Companies policies in effect at the time of the agent's request.

[Doc. #1, Ex. A]. The fact that the Agent Agreement expressly affords the Plaintiff access to the Agent Administrative Review Board, and its procedures, in the last sentence of a paragraph prescribing the Defendant companies' right to terminate the Plaintiff, is sufficient, together with the facts contained in the Complaint, to

support Plaintiff's claim that the parties intended the Plaintiff's termination to be subject to its Agent Administrative Review Board process and breached their contractual duty by failing to avail him of the review process. The Agent Agreement does not make reference to the Handbook and the Handbook is not part of the record before this Court.

The Plaintiff also claims that the Defendants breached the Handbook and thereby the Agent Agreement by failing to pay Plaintiff's valid disability claim which Defendant was obligated to do under the terms of the Handbook. The Court notes that Plaintiff also claims that Defendants' obligation to pay the disability claim also arises under the terms of the Agent Agreement itself. Without the Handbook in the record before the Court, the Court cannot make a determination on whether the Handbook actually requires the Defendants to pay Plaintiff's disability claim. Moreover, there are insufficient facts in the Complaint and the exhibits thereto, to establish that Defendants were bound to comply with the terms of the Handbook relating to disability claims. The Handbook is not referenced in the Agent Agreement and the Agent Agreement defines agreement as used there and in so defining that term does not include the Nationwide Agency Administration Handbook. [Doc. #1, Ex. A, ¶22]. Furthermore, it expressly includes in the definition of the agreement only agreements delineated by proper nouns "as well as any documents referenced and incorporated." [*Id.*] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")

Therefore, Plaintiff has not pled sufficient facts to support his claims that Defendants breached the Handbook and thereby the Agent Agreement by failing to pay his disability claim.

> ### iii. Analysis of Breach of Contract Claim for Failure to Pay Amounts Due under Paragraph 12 of the Agent Agreement

Plaintiff also argues that Defendants breached the Agent Agreement by failing to pay the amount of Extended Earnings to Plaintiff upon cancellation of the Agent Agreement under Paragraph 12(b) and 12(d)(3) of the Agent Agreement and by failing to pay automobile loan and credit card amounts due under Paragraph 12(d). Paragraph 12 governs "Agency Security Compensation" and the plain language of the Paragraph relates solely to the computation and payment of "Deferred Compensation Incentive Credits." Paragraph 12 outlines that for each calendar year, an independent contractor agent can earn bonus compensation pursuant to a "Deferred Compensation Incentive Credit Formula" which provides that an independent contractor can qualify to earn a percentage of earnings generated as incentive compensation. [Doc.#1, Ex. A at ¶12(a)]. In addition, under Paragraph 12(b) an independent contractor agent may be entitled to Extended Earnings payable upon a qualified cancellation of the Agreement provided "you meet the qualification requirements for [Deferred Compensation Incentive Credits] as outlined in 12(a)." [*Id.* at ¶12(b)]. Paragraph 12 (d) simply outlines the procedure for payment of such deferred incentive compensation and

Extended Earnings.  Moreover, the payment provision in Paragraph 12(d) is only triggered upon a showing that an independent contractor agent is entitled to a "Deferred Compensation Incentive Credit" as outlined in Paragraph 12(a) and (e). At the motion to dismiss stage, Plaintiff has plausibly pled that he was entitled to Extended Earning under Paragraph 12 which the Defendants failed to pay.

Plaintiff also alleges that Defendants breached the Agent Agreement by failing to pay automobile loans or credit card amounts pursuant to Paragraph 12(d).  However, there is no reference anywhere in Paragraph 12 to automobile loans or company credit cards or for that matter to any costs incurred by an independent contractor agent.  The Court finds no support for Plaintiff's claim that Paragraph 12 requires the payment of such amounts due in the record.  The provision Plaintiff cites governs bonus compensation and makes no mention of expenses or costs incurred by Plaintiff while Plaintiff was acting as an independent contractor agent for Defendant.  Moreover, Paragraph 2 of the Agent Agreement explicitly states that "as an independent contractor, you will pay all expenses with your Nationwide insurance agency, including but not limited to expenses for manuals, forms, record supplies and computer service.  You will not incur any indebtedness on behalf of us in connection with the expenses resulting from your Nationwide Agency." [Doc.#1, Ex. A at ¶2].   An automobile loan and credit card amounts are clearly expenses that Plaintiff incurred in running his "Nationwide insurance agency" and the plain language of the contract requires that Plaintiff alone bears the burden of such costs.

However, Plaintiff has placed into the record a December 12, 2002 memorandum describing a program to provide new Nationwide Agents a portfolio of policies which is apparently incorporated into the Agent Agreement as the memorandum is signed on the same day the Agent Agreement was executed by the same parties and provided to Plaintiff a week before he executed the Agent Agreement. [Doc. #1, Ex. A]. The program called "Pasport IV" was intended to provide a foundation to build an insurance agency. [*Id.*]. Under the program, the parties developed a Viability Sales Plan intended to "generate cumulative sales and cumulative deferred compensation that will sustain your agency after the Passport Period." [*Id.*]. The memorandum further provides that:

> You are responsible for the expenses of your agency as defined in your Nationwide Agent Agreement. During the PASPORT period, we will evaluate your ability to manage expenses in your agency along with other variables such as sales, policyholder services, and office dynamics. Our willingness to offer some expense reimbursement will be done on the facts of each case but generally we anticipate that the renewal service fees of the assigned policies will assist with the expenses.

[*Id.*]. The Plaintiff has therefore sufficiently pled a claim of entitlement to reimbursement for expenses under this provision with sufficient specificity to put Defendants on notice of the basis of this claim and showing that he is entitled to the reimbursement he claims. Fed. R. Civ. P. 8(a)(2).

iv.  *Analysis of Breach of Contract Claims in Connection with Paragraph 8 of the Agent Agreement*

Plaintiff argues that Defendant breached the Agent Agreement by failing to provide Plaintiff with paycheck information and commission statements. In the complaint, Plaintiff summarily alleges there was a breach without identifying the specific provision of the Agreement that is the basis for such breach. Plaintiff

only articulated in his opposition to the motion to dismiss that the basis for this breach was Paragraph 8 of the Agent Agreement. However, Plaintiff does not explain why Paragraph 8 obligated Defendants to provide such information and statements. Paragraph 8 governs "Compensation" and provides in relevant part that "[i]t is agreed that we will pay you any and all compensation earned by you, but not credited to your account at the time of entering into this Agreement, on business written by you while employed by us under our agent's employment agreement." [Doc. #1, Ex. A at ¶8]. Defendants point out that there is no specific reference to paycheck information and commission statements in Paragraph 8 or any other paragraph in the Agent Agreement. Moreover, the content of Paragraph 8 governs what compensation is owed to Plaintiff rather than what information Plaintiff is entitled to receive from Defendant regarding compensation that was previously paid. The Court notes that Paragraph 8 also provides that an independent contractor agent will be compensated in accordance with attached "General Conditions and Schedules of each Company." [*Id.*]. However, Plaintiff has not included with his complaint any of these schedules incorporated in the Agent Agreement. Moreover, Plaintiff has not alleged that the obligation to provide paycheck information and commission statements flows from any attached schedules.

However, the Connecticut Supreme Court explained in *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424 (2004) that

It is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship ... [E]very contract imposes upon each party a duty of good faith and fair dealing in its

performance and its enforcement.  In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term.  To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive .... Bad faith means more than mere negligence; it involves a dishonest purpose.

*De La Concha,* 269 Conn. at 432 (internal quotation marks and citations omitted.)

Thus, Nationwide had an implied duty not to do anything that would injure Garbanski's right to receive the compensatory benefits to which he was entitled under the Agent's Agreement.  Without a statement explaining the computation used to arrive at the aggregate amount of any payment made or withheld by Nationwide, it would be difficult, if not impossible for Garbanski to determine whether he received the compensatory benefits to which he was entitled. Employers routinely provide employees a statement showing the computation used to determine the amount of compensation paid to an employee.  Such a computation is particularly vital given the complex compensation scheme outlined in the Agent Agreement.  The Defendants' insistence that such a computation was not reasonably inferred by the Agent Agreement is sufficient, together with the allegations of the Complaint to sustain a claim that its refusal to provide a statement constituted a design to mislead or deceive Garbinski or a neglect or refusal to fulfill its duty or contractual obligation, not prompted by an

honest mistake as to its duties.  Defendants' motion to dismiss Garbinski's claim for failure to provide paycheck information and commission statements is denied.

### v.   *Analysis of Remaining Breach of Contract Claims*

Lastly, Plaintiff argues that Defendants breached the Agent Agreement by failing to permit him to convert various group insurance benefits and failing to pay his valid disability claim under the terms of the Agent Agreement.  Defendant moves to dismiss these allegations arguing that none of these obligations are terms of the Agent Agreement and that "none of these things are even mentioned in the Agent's Agreement."  [Doc. #20 at 10].  Plaintiff has not identified in the Complaint nor in his opposition to the motion to dismiss which provision(s) in the Agent Agreement require Defendant to pay the disability claim or permit Plaintiff to convert group insurance benefits.   As Defendants contend, the Agent Agreement does not mention group insurance benefits or the payment of disability claims.  The term "disability" is in fact only mentioned in Paragraph 12 and that reference relates to the payment of deferred compensation upon a cancellation of the Agreement due to permanent disability and to the timing of such deferred compensation payment.  There is nothing in Paragraph 12 that relates to the obligation of Defendants to pay an independent contractor agent's disability claim.  Therefore Plaintiff has failed to plausibly plead that Defendant breached the Agent Agreement by failing to pay Plaintiff's disability claim or allow Plaintiff to convert group insurance benefits.

### Analysis of Franchise Act Claim

Plaintiff alleges that Defendants violated Connecticut's Franchise Act, Conn. Gen. Stat. § 42-133e -133g by terminating the Agent Agreement based "upon lack of adequate notice contained therein and the lack of any 'good cause' for said terminations and/or cancellations as required thereunder." [Doc. #1]. Plaintiff has sufficiently pled that under the Agent Agreement, Plaintiff was a "franchisee" as that term is broadly defined in Conn. Gen. Stat. § 42-133(e)d and that Defendants were "franchisors" as that term is defined in Conn. Gen. Stat. § 42-133e(c). The statute defines franchise as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor …; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate ...." Conn. Gen. Stat. § 42-133e(b). The statute further "prohibits franchisors from terminating or cancelling a franchise except for good cause and requires franchisors to give the franchisee written notice of such termination [or] cancellation…at least sixty days in advance to such termination with the cause started thereon.." Conn. Gen. Stat. § 42-133f(a). Lastly, the Franchise Act also prohibits "any contractual waiver of a franchisee's statutory protections and overrides any contractual provision to the contrary in a covered franchise agreement." *Stetzer v. Dunkin' Donuts, Inc.*, 87 F. Supp. 2d 104, 113 (D. Conn. 2000).

Defendant moves to dismiss Plaintiff's Franchise Act claims arguing that the relationship between Plaintiff and Defendants is a traditional agency relationship not a franchise one and that "the financial realities of the business relationship between an insurance agent and an insurance company are inconsistent with such a franchise relationship." [Doc. #20 at 11]. No Connecticut court has yet addressed whether the Franchise Act applies to an insurance company-insurance agent relationship. Plaintiff argues that another court in the District of Connecticut has held that the Connecticut Franchise Act applies to the insurance company-insurance agent relationship. *Charts v. Nationwide Mut. Ins. Co.*, 397 F. Supp. 2d 357 (D. Conn. 2005) *rev'd Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116 (2d Cir. 2008). However as Defendants note the Second Circuit reversed the judgment of the district court in *Charts* based on the fact that the former debtor's new agency agreement with defendants, his prior agency agreement and the claims arising from the both agreements belonged to the former debtor's bankruptcy estate and therefore there was no jurisdiction to hear such claims brought directly by former debtor. Even assuming the District Court had jurisdiction to hear the claims in *Charts*, the *Charts* court at most suggested that it was plausible that the Franchise Act applied within the insurance context, but did not specially hold it did so. The *Charts* court assumed without specifically deciding that the Franchise Act applied to the facts of the case.

In *Charts*, a jury granted verdict for plaintiff and defendants brought a motion for judgment as a matter of law and argued that the plaintiff's Franchise

Act claims should not have gone to the jury. In addition, the defendants argued that since insurance companies and their agents are subject to extensive regulation under the Connecticut Insurance Code, the Connecticut legislature could not have intended the good cause termination requirements under the Franchise Act to apply to insurance agents. *Charts*, 397 F. Supp. 2d at 366-367. The court concluded that there was no evidence that the "Connecticut legislature did intend to preclude insurance agents from invoking the protections of the Connecticut Franchise Act … [and that] there was no clear indication that the Connecticut legislature intended such preemption by the insurance statues and regulations." *Id.* Further, the court held that defendant "has not made a compelling argument in the absence of clear legislative intent why an insurance agent should not be protected by the Connecticut Franchise Act if a jury concludes that he or she otherwise meets the tests for a franchise relationship." *Id.* Therefore at most the *Charts* court concluded that the Connecticut Insurance Code did not preempt the Connecticut Franchise Act and acknowledged that the insurance company - insurance agent relationship could possibly meet the test for a franchise relationship.

To supports its argument that the Franchise Act should not apply, Defendants cite to *Getty Petroleum Mktg. v. Ahmad*, 757 A.2d 494, 497-98 (Conn. 2000) where the Connecticut Supreme Court held that agreements between lessor petroleum company and lessees of gas stations did not create a franchise reasoning that lessee did not bear the burden of marketplace risk that is indicative of an independent business operation as lessee's compensation was

not affected by the rise and fall in the market price of motor fuel and that the lessor gas company was really selling its own gasoline through which lessee was acting as commission agent. The *Getty* court concluded there was "insufficient evidence to establish that defendants had any entrepreneurial responsibility as to the sale of gasoline or the gasoline itself." Defendant argues that like *Getty* Plaintiff did not own the policies he procured and serviced and there is no evidence that he had entrepreneurial responsibility as he was paid on commission by Defendants not Nationwide policy holders and that Defendants did not require Plaintiff to purchase large amounts of inventory for re-sale to the public. [Doc. #20 at 15]. Defendants also note that other courts in other jurisdictions have concluded that the insurance company-insurance agent relationship is not a franchise relationship in connection with other state franchise acts. *See Vitkauskas v. State Farm Mut. Auto Ins. Co.*, 509 N.E.2d 1385, 1390-91 (Ill. App. Ct. 1987) (interpreting the Illinois Franchise Disclosure Act); *Keeney v. Kemper Nat'l Ins. Cos.*, 960 F. Supp. 617, 625 (E.D.N.Y. 1997) (interpreting New York's Franchise Sales Act).

As there is no direct caselaw on point interpreting the Connecticut Franchise Act, this is a matter of first impression before the Court. The Connecticut Supreme Court has concluded that the definition of a franchise "requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." *Getty*, 253 Conn. at 497 (internal quotation marks and citation

omitted).    The Court looks to the terms of the Agent Agreement to assess whether it is plausible under the Agent Agreement that Plaintiff and Defendants had such a contractual relationship.    The terms of Paragraph 4 of the Agent Agreement suggest that Plaintiff did have the right to offer, sell or distribute Defendants' goods and services.    Paragraph 4 provides in relevant part: "[i[t is agreed and understood that you will represent us exclusively in the sale and service of insurance."  [Doc. #1, Ex. A at ¶4].

In addition, the terms of the Agent Agreement also suggest that there was a marketing plan or system prescribed in substantial part by the franchisor and that the plan or system was substantially associated with Defendants' "trademark, service mark, tradename, logotype, advertising or other commercial symbol." Conn. Gen. Stat. § 42-133e(b).  For example under Paragraph 5, Plaintiff agreed to "use the Companies' name and logo in any material which could directly or indirectly lead to the sale of the NW product, in accordance with the Companies' policies and procedures." [Doc. #1, Ex. A at ¶5].    Under Paragraph 6, the "Companies grant to you a personal, non-exclusive, non-transferable, limited license to use the trademarks, service marks and names ('Marks') of the Companies on or in connection with the business conducted pursuant to this Agreement … you further agree that all items or materials bearing the Marks produced or distributed by you shall be maintained at a high-quality standard acceptable to the Companies.    All materials that incorporate the Marks or otherwise imply a relationship with Nationwide products or services must be pre-approved by the Companies." [*Id.* at ¶6].  Lastly under Paragraph 15, the parties

agreed that "each Company will prescribe rules, regulations, price and terms under which it will insure risks and each Company retains the right to change, alter or amend such rules, regulations, prices and terms, including the right to limit, restrict or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems is advisable to do so and without notice to or consent of the Agent." [*Id.* at ¶15].

Accordingly, at the motion to dismiss stage Plaintiff has plausibly pled that the relationship established under the Agent Agreement could state a claim for relief under the Franchise Act.  The Court notes that whether the nature of the relationship in practice actually met the statutory definition for a franchise under Connecticut law is a question best left for summary judgment or trial after the parties have conducted discovery into the issue as is the larger question of whether the purposes and intent of the Franchise Act should extend to such a relationship.  *See Dittman & Greer, Inc. v. Chromalox, Inc.*, No.3:09-cv-1147, 2009 WL 3254481, at *2 (D. Conn. Oct. 6, 2009) (noting that in determining whether a business relationship constituted a franchise the Connecticut Supreme Court set forth several factors to guide the marketing plan analysis and that such analysis "depends not only on the written agreements between the parties *but also their conduct*") (citation omitted) (emphasis added).  Defendants' motion to dismiss Plaintiff's Franchise Act claims is therefore denied.

<u>Analysis of CUPTA Claim</u>

Defendant moves to dismiss Plaintiff's CUTPA claims arguing that Plaintiff has failed to allege facts that could warrant a CUTPA violation.  However, as Plaintiff asserts Connecticut courts have held that a violation of the Connecticut Franchise Act can constitute a violation of CUTPA.   In particular, Connecticut Courts have held that where franchisor did not have good cause for termination of franchise agreement, franchisor might also be able to state a violation CUTPA. *Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc.*, 250 Conn. 334, 367-368 (1999); *Stetzer*, 87 F. Supp. 2d at 115; *but cf. Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 680 (Conn. 1985) (noting that "[i]t is clear to us that a violation of the Franchise Act would not necessarily implicate the interests protected by CUTPA.   Hence, the evidence that Micro Switch presented to challenge the Franchise Act claims might have differed significantly, both in kind and in scope, from that which it would have used to counter the more general CUTPA claims.").  Plaintiff explicitly alleged that Defendants terminated the Agent Agreement without good cause in violation of the Franchise Act and therefore have plausibly pled a CUTPA violation.

Defendants also argue that Plaintiff's CUTPA claim is not pled with the requisite particularity as the Complaint "does not allege with specificity what Defendants did that actually violated CUTPA."  [Doc. #20 at 19].   In the Complaint, Plaintiff explicitly incorporated the allegations contained in paragraphs 1 through 7 of the third count regarding the Franchise Act into the fourth count regarding CUTPA.  [Doc. # 1].  Therefore, Plaintiff has pled with particularity that its theory that Defendants violated the Franchise Act by

terminating the Agent Agreement without good cause is also the basis for its CUTPA claim. Lastly, Defendants also argue that Plaintiff's CUTPA claim is based on nothing more than its breach of contract claim and a breach of contract cannot state a CUTPA violation. However it is clear on the face of the complaint that Plaintiff's CUTPA claim is based on its Franchise Act claim which can state a CUTPA violation. Since as discussed above Plaintiff's Franchise Act claim has not been dismissed, Plaintiff's corresponding CUTPA claim is still viable. Accordingly, Defendants' motion to dismiss Plaintiff's CUTPA claim is denied.

### Analysis of Interference with Business Expectancy Claim

Defendants also argue that Plaintiff's claim for tortious interference with business expectancy also fails to state a claim as Plaintiff could not have a reasonable expectation that he would continue to receive commissions as the Agent Agreement was terminable at will and without cause. The elements of a claim for tortious interference with business expectancies are (1) a business relationship between the plaintiff and another party; (2) Defendant's intentional interference with the business relationship while knowing of the relationship; (3) as a result of interference, plaintiff suffered actual loss. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). "A claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself ... Accordingly, the plaintiff must plead and prove at least some improper motive or improper means ... [F]or a plaintiff successfully to prosecute such an action it must prove that ... the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant

acted maliciously ... In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification." *Energy Solutions, Inc. v. Realgy, LLC*, 114 Conn.App. 262, 272 (2009) (internal quotation marks and citation omitted).   "Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort." *Biro v. Hirsch*, 62 Conn.App. 11, 21 (2001) (internal quotation marks and citation omitted.).   Accordingly, "[o]ne could avoid liability under this tort by not acting maliciously or in bad faith." *Kelly Property Dev., Inc. v. Lebanon*, 226 Conn. 314, 342 (1993).

Plaintiff alleges that his tortious interference claim is based on his Franchise Act claim as Defendants interfered with his business expectancy by improperly terminating the Agent Agreement without good cause in violation of the Franchise Act.   Assuming that the Franchise Act applies to Plaintiff and Defendants' relationship, absent Plaintiff engaging in conduct that could provide Defendants with good cause to terminate the Agent Agreement, Plaintiff had a reasonable expectation that he would continue to receive commissions from the sell and renewal of insurance policies.   While it is true that the Agent Agreement itself provided for termination at will and without cause, Plaintiff has alleged that his expectation is based on the Franchise Act which prohibits any contractual waivers of a franchisee's statutory protections.   *See Chem-Tek, Inc. v. General Motors Corp.*, 816 F.Supp. 123, 130 (D. Conn. 1993) (denying motion to dismiss tortious interference with business expectancy claim that was based on

manufacturer's termination of an agreement with a distributor without cause in violation of the Connecticut Franchise Act).  Lastly Plaintiff has alleged that the termination of the Agent Agreement was wrongful and without cause and as such was an intentional interference without justification.  Accordingly, Plaintiff has alleged sufficient facts which give rise to a plausible allegation of interference with business expectancy.   In addition, to the extent that Plaintiff is alleging that Defendants have failed to pay him commissions on past policies that he issued which he has right to continue to receive even after cancellation of the Agreement, he could also state a claim for interference with business expectancy. Defendants' motion to dismiss Plaintiff's interference with business expectancy claim is therefore denied.

<u>Conclusion</u>

Based upon the above reasoning, the Defendant Nationwide Securities, LLC's  [Doc. #17] motion to dismiss is GRANTED and Defendants' [Doc.# 19] Motion to Dismiss is GRANTED IN PART and DENIED IN PART.   Plaintiff's breach of contract, Franchise Act, CUTPA, and interference with business expectancy claims shall remain extant in accordance with the Court's decision. The remainder of Plaintiff's claims are hereby dismissed.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

**Dated at Hartford, Connecticut: July 26, 2011**