# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GROGERY J. GARBINKSI, | : |
|     PLAINTIFF, | : |
| | : CIVIL ACTION NO. 3:10cv1191(VLB) |
| | : |
| v. | : JULY 24, 2012 |
| | : |
| NATIONWIDE MUTUAL INSURANCE; | : |
| COMPANY, ET AL. | : |
|     DEFENDANTS. | : |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. #74]

Plaintiff Gregory Garbinski ("Garbinski" or "Plaintiff") brings this action against Defendants Nationwide Mutual Insurance Company, et al. (collectively "Nationwide" or "Defendants"), alleging breach of contract of an Independent Contractors Agent's Agreement (the "Agent Agreement") (Count 1); violation of Connecticut's Franchise Act (the "Franchise Act" or "CFA"), Conn. Gen. Stat. § 42-133 (e)-(g) (Count 3); violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (Count 4); and interference with business expectancy (Count 5). Three other claims (Counts 2, 6-7), as well as those portions of Counts Three, Four, and Five that were against Nationwide Securities, LLC, and the four individually named Defendants, were previously dismissed by this Court. [Dkt #37, Mem. of Decision on Motion to Dismiss]. Before the Court is Defendants' motion for summary judgment as to all of Plaintiff's remaining claims and Defendants' counterclaims.  For the reasons stated hereafter, Defendants' motion for summary judgment is GRANTED.

1

**Facts**

The Court notes before setting forth the undisputed facts that Local Rule 56(a) imposes several specific requirements on the parties when arguing a summary judgment motion. Each statement of material fact in a Local Rule 56(a)(1) or Local Rule 56(a)(2) statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)(2) statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." [Local Rule 56(a)(3)]. The Local Rule further provides that

> The "specific citation" obligation of this Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. *Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted* in accordance with Rule 56(a)1or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and, when the opponent fails to comply, an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law.

[Local Rule 56(a)(3) (emphasis added)]. In the present case, where Garbinski has failed to provide a specific citation in his Local Rule 56(a)(2) statement, the Court has deemed Nationwide's statement as true in accordance with the Local Rule.

Garbinski was an insurance agent who represented Defendants from January 1, 2003 until April 9, 2009 pursuant to the Agent Agreement and the Securities Agreement. Defendants Nationwide Mutual Insurance Company,

2

Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Assurance Company of Florida, Colonial County Mutual Insurance Company, and Nationwide Lloyds were party to the Agent Agreement with Garbinski.

Plaintiff Gregory J. Garbinski is a citizen of Clinton, Connecticut. [Dkt. #78, Def.'s Rule 56 Stmt. at ¶ 1]. Defendants Nationwide Mutual Insurance Company ("Nationwide"), Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Assurance Company, Nationwide Insurance Company of Florida, Colonial County Mutual Insurance Company, and Nationwide Lloyd's (collectively "Nationwide"), are insurance companies incorporated in and/or have their principal places of business in Ohio and other states, not including Connecticut. [*Id.* at ¶ 2].

In 1992 Garbinski joined Nationwide's Agent Development Program (NADP) as an employee agent for Nationwide. [*Id.* at ¶ 3]. Garbinski stayed in the NADP program until 1995, when he transitioned to independent contractor status. [*Id.* at ¶ 4]. As an independent contractor agent for Nationwide, Garbinski was responsible for maintaining his own employees, leasing his own office space, paying his own agency expenses, and the other general requirements of an independent business owner. [*Id.* at ¶ 5]. Garbinski's agency was located in Leetsdale, Pennsylvania. [*Id.* at ¶ 6].

In 1998, Garbinski accepted an employee position with Nationwide as a Sales Technical Specialist, and relocated to Connecticut. [*Id*. at ¶ 7]. A year later, Garbinski was promoted to Sales Manager. [*Id*. at ¶ 8]. In that position he had ultimate responsibility to work with 43 of Nationwide's independent contractor and employee agents in the New England area. [*Id*.].

In 2003, Garbinski formed BMG Insurance & Financial Services ("BMG"), in order to acquire the servicing rights to two Nationwide agencies where the agents were retiring. [*Id*. at ¶ 9]. Garbinski purchased the servicing rights to these two books of business in 2003. [*Id*. at ¶ 10]. In order to finance the acquisition of the servicing rights to these two books of business, Garbinski and BMG entered into Credit Agreement and Promissory Notes with Nationwide Federal Credit Union (n/k/a Nationwide Bank) ("Nationwide Bank") in the amounts of $50,000 and $194,393. [*Id*. at ¶ 11]. Over time, Garbinski and BMG took other loans from Nationwide Bank to fund Garbinski's agency. [*Id*. at ¶ 12]. On March 16, 2005, Garbinski and BMG borrowed $100,000.00 from Nationwide Bank, which was journalized in and memorialized byanother Credit Agreement and Promissory Note signed by Garbinski both individually and as the officer of BMG. [*Id*.].  On March 10, 2006, Garbinski and BMG borrowed $50,000.00 from Nationwide Bank, which was journalized in another Credit Agreement and Promissory Note signed by Garbinski both individually as the borrower and as the officer of BMG. [*Id*. at ¶ 13]. These loans were "straight loans" that Garbinski "had to pay back." [*Id*. at ¶ 14].

When Garbinski opened BMG in 2003, he entered into an Independent Contractor Agent's Agreement ("Agent Agreement" or "ICA Agreement") with Nationwide, effective January 1, 2003. [*Id.* at ¶ 15]. Section 1 of the Agent Agreement was titled "Independent Contractor" and provided "the parties agree that the purpose of this Agreement will be best served by your acting as an independent contractor. Therefore, it is agreed that you are an independent contractor for all purposes." [*Id.* at ¶ 16]. Section 1 continues on to provide that "[a]s an independent contractor, you have the right to exercise independent judgment as to time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of the Agreement consistent with your obligation to provide the best available service to the Companies and the customer." [Dkt. # 1-4, Agent Agreement at ¶ 1].

Section 2 of the ICA Agreement was titled "Expenses" and provided "[a]s an independent contractor, you will pay all expenses in connection with your Nationwide insurance agency, including, but not limited to, expenses for manuals, forms, record supplies, and computer service." [Dkt. #78, Def.'s Rule 56 Stmt. at ¶ 17]. Section 5 of the ICA Agreement was titled "General Conduct and Representation" and provided "[y]ou will maintain a good reputation in the community that you serve and will direct your efforts in the field of insurance toward advancing the business and interest of [Nationwide] to the best of your ability." [*Id.* at ¶ 18]. Section 10 of the ICA Agreement was titled "Cancellation" and provided in pertinent part: "due to the personal nature of our relationship, you or [Nationwide] have the right to cancel this Agreement at any time with or

without cause after written notice has been delivered to the other or mailed to the other's last known address." [*Id.* at ¶ 19].

Garbinski leased space for his agency and was responsible for the lease. [*Id.* at ¶ 20]. Garbinski was responsible for paying all of the expenses of his own agency. [*Id.* at ¶ 21]. Garbinski had the right to decide whether to hire and fire employees who worked in his agency (subject to Nationwide's obligation to refuse an appointment to Garbinski's associate agents for various reasons, as required by Connecticut insurance law). [*Id.* at ¶ 22. *See also* Dkt. # 93-6, Garbinski Dep. at 35:19-36:22)]. Nationwide retained ownership of its policies, with Garbinski having servicing rights as to those policies. [Dkt. #78, Def.'s Rule 56 Stmt. at ¶ 23. See also Dkt. # 93-6, Garbinski Dep. at 116:23-117:7; Declaration of Shawn Patterson at ¶¶ 5-6 and Exhibit 2 thereto]. Garbinski was required to hold any monies he received from policyholders in trust and that those monies were property of Nationwide; never Garbinski's property. [Dkt. #78, Def.'s Rule 56 Stmt. at ¶ 24]. Garbinski was compensated solely on commission; he was paid based solely on the amount of insurance premium he procured for Nationwide. [*Id.* at ¶ 25]. Garbinski had no role in setting Nationwide's premium rates. [*Id.* at ¶ 26].

Beginning in 2004, Garbinski's agency struggled to grow, mostly because of market pressures stemming from what he termed uncompetitive rates set by Nationwide. [*Id.* at ¶ 27]. From 2004-2007, Garbinski participated in Nationwide's Agency Choice Program, pursuant to which he was permitted to broker insurance

with companies outside of Nationwide, such as Hartford, Progressive, and others. [*Id.* at ¶ 28. *See also* Dkt. # 93-6, Garbinski Dep. at 42-44].

On March 22, 2009, Garbinski got into a domestic dispute with his wife, Christina Garbinski ("Christina" or "Mrs. Garbinski") over religion. [Dkt. #78, Def.'s Rule 56 Stmt. at ¶ 29]. The fight began around 3:00 pm that afternoon. [*Id.* at ¶ 30]. The fight stemmed from Christina attending church and various Christian conferences and seminars, and a belief by Garbinski that his wife was being brainwashed as a result of attending those events. [*Id.* at ¶ 31]. Garbinski had been drinking and on methadone, and the argument escalated when they went outside and then into the family's garage. [*Id.* at ¶ 32]. Christina remembered this argument was more heated then normal, and Garbinski was very angry. [*Id.* at ¶ 33].

Around 5:00 on the evening of March 22nd, Christina and her children were getting ready to go to church. [*Id.* at ¶ 34]. Garbinski retrieved his gun from his briefcase downstairs and took it upstairs to the bedroom where Christina was getting ready. [*Id.* at ¶ 35]. Christina and the children were in the bedroom getting ready to leave for church, but the kids were concerned about leaving Garbinski—still in a drunken state—at home alone with a gun. [*Id.* at ¶ 36]. At that point, Garbinski's teenage daughter called 911 fearing that someone would get hurt. [*Id.* at ¶ 37]. Then the children exited the house and stayed with a neighbor for the next five hours. [*Id.* at ¶ 38]. Christina stayed with Garbinski and asked Garbinski to put the gun away. [*Id.* at ¶ 39]. Garbinski responded by waving his gun back and forth horizontally in front of his wife, asking her "Does this frighten you?" [*Id.*

at ¶ 40]. Christina was fearful that the gun could accidentally go off. [*Id.* at ¶ 40]. Garbinski also began playing with the hammer (or slide) on the top of the gun, pulling back and letting it fall forward. [*Id.* at ¶ 42].

The children called 911. The police responded and set up a perimeter outside the Garbinski home. [*Id.* at ¶ 43. *See also* Dkt. # 90-56 (State of Connecticut Form JD-CR-71-LP dated March 23, 2009) at 3 (Clinton Police Department Supplemental Narrative)].

After 1-2 hours in the home with her husband, Christina Garbinski left the house and went outside to the police perimeter when her husband went to use the bathroom. [Dkt. # 78, Defs.' Rule 56 Stmt. at 45]. The police remained outside the Garbinski house for three hours. [*Id.* at 46]. The police finally set off two flash bombs to attempt to arouse Garbinski – who had apparently fallen asleep – and get him to come out of his house. [*Id.* at 47]. Garbinski exited the house and was then taken into police custody. [*Id.* at 48]. Court documents indicate that Garbinski was charged with one felony and two misdemeanors, although it appears that the felony was changed to a misdemeanor; a later document reflects him having been charged with three misdemeanors. [Dkt. # 90-56 (State of Connecticut Form JD-CR-71-LP dated March 23, 2009), Dkt. # 90-57 (State of Connecticut Form JD-CR-71 dated October 29, 2009)]. Garbinski attributes this to a typographical error. [*Id.* at ¶ 49. *See also* Garbinski Dep. 59:8-61:9 Exhibits 6 and 7 thereto].

After the incident on March 22nd, Christine Garbinski took out a restraining order against her husband, who lived in a hotel for a month. [Dkt. # 78, Defs.' Rule

56 Stmt. at ¶ 50]. Garbinski was also investigated by Child and Family Services for about six weeks following the March 22nd incident. [*Id.* at ¶ 51]. Garbinski testified that this incident was "a very bad timing decision." [*Id.* at ¶ 52. *See also* Garbinski Dep. 64:9-10]. Garbinski also testified that he agreed that this event was "not good" for his public reputation and that it did not help his public reputation as a Nationwide agent. [Garbinski Dep. 64:20-65:9]. Garbinski further admits that he had been taking up to 72 pills a day at one point prior to the incident of March 22, 2009 in an attempt to control Crohn's Disease and neuropathy conditions, and that he had received out-patient treatment for alcohol abuse. [Dkt. #91, Pl.'s Rule 56 Stmt. at ¶ 54; Garbinski Dep. 57:17-58:19].

The events and police presence at Garbinski's house on March 22, 2009 were reported on the local television news as well as on Internet and other news media. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 56. *See also* Dkt. 93-6, Garbinski Dep. at 51:21-23, 55:-57:16; Dkt. 78-12 at 13 (Hartford Courant Article)]. As a result, Nationwide received several communications from policyholders noting the incident and their desire to switch from Mr. Garbinski as their Nationwide agent. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 57. *See also* Dkt. # 78-13, Declaration of Shawn Patterson at ¶ 7; Dkt. # 93-47M (Complaints Received by Nationwide)]. On March 24, 2009, Nationwide notified Garbinski that it was suspending his access to Nationwide's system until it had concluded its analysis and review of the events of March 22, 2009. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 58]. Garbinski was paid his commissions during this suspension of his agency. [*Id.* at ¶ 59]. On April 9, 2009, Garbinski was notified by overnight mail at his home and office that his Agent

**9**

Agreement was being canceled for violation of Section 5 (General Conduct and Representation). [*Id.* at ¶ 60]. A copy was provided to Garbinski's counsel as well. [*Id.*].  Section 5 of the Agent Agreement provides as follows: "General Conduct and Representation. You will maintain a good reputation in the community that you serve and will direct your efforts in the field of insurance toward advancing the business and interest of the Companies to the best of your ability." [Dkt. # 1-4 at 16].

Pursuant to Section 4 of the Agency Administration Handbook, Garbinski was required to request an agency review board hearing in writing within five calendar days of his date of cancellation. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 61].[1] Nationwide never received a written request for an agency review board hearing from Garbinski. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 62. *See also* Dkt. #78-13, Declaration of Shawn Patterson at ¶4]. While Garbinski contends he made such a request for an agency review board hearing, he admits that he is unsure whether he requested the hearing within five calendar days of receiving his April 9, 2009 letter of cancellation. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 63].

On February 17, 2010, Carrie Edwards, Agency Benefits Counsel for Nationwide, wrote to Garbinski in response to his January 30, 2010 letter and provided him copies of his IRS 1099 tax forms for 2007, 2008, and 2009 as well as a copy of his year-to-date production statistics for 2007, 2008, and 2009. [*Id.* at ¶

---

[1] *See* Dkt. # 93-5, Nationwide Agency Administration Handbook, § 4 ("To request a Review Board, the agent must submit a written request to his/her Sales Manager, Sales Associate Vice-President, or Sales Administration and Contracts Leadership Team. This request must be made within 5 calendar days after the agent is given written notification of the cancellation.").

64]. Furthermore, during the summer and fall of 2011, Nationwide, through counsel in this action, voluntarily provided Garbinski with all commission payment records he requested for the years 2006-2009. [*Id.* at ¶ 65].

In June 2000, Garbinski submitted an elections form to Nationwide, pursuant to § 409A of the Internal Revenue Code, indicating his elections for distributions of extended earnings and other deferred compensation. [*Id.* at ¶ 66]. He elected to take his extended earnings payout over a ten-year period for tax purposes. [*Id.* at ¶ 67]. In May 2003, Garbinski submitted a new elections form to Nationwide. [*Id.* at ¶ 68]. Garbinski agrees this new elections form did not contain any mark or other notation indicating he elected to change this ten-year distribution for extended earnings. [*Id.* at ¶ 69 *See also* Dkt. #78-11, Elections Form at 4]. Garbinski filed his Complaint in this action on June 24, 2010. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 70].

Legal Standard

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The motion "will not be defeated merely . . . on the basis of conjecture or surmise." *Id.*, quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).  In addition, "[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09civ1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of

proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

i.    *Connecticut Franchise Act Claim*

Nationwide urges this court to grant summary judgment as to Garbinski's Connecticut Franchise Act claim arguing that the Franchise Act is inapplicable to the relationship between insurers and their agents. Nationwide also argues that in the alternative, even if the CFA does apply to the insurer-agent relationship, Nationwide is still entitled to summary judgment because no reasonable jury could conclude that Nationwide did not have good cause to cancel Garbinski's ICA agreement. Garbinski maintains that the CFA applies to the insurer-agent relationship and that Garbinski's agency was cancelled without good cause. This Court agrees that the CFA does not apply to the relationship between Garbinski and Nationwide. Moreover, even assuming that the CFA is applicable to this insurer-agent relationship, no reasonable jury could find that Nationwide did not have good cause to cancel Garbinski's agency.

Garbinski alleges that Nationwide violated Connecticut's Franchise Act, Conn. Gen. Stat. § 42-133e -133g by terminating the Agent Agreement based "upon lack of adequate notice contained therein and the lack of any 'good cause' for said terminations and/or cancellations as required thereunder." [Dkt. #1-4, Complaint, at 9]. The statute defines franchise as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the

business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor …; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate ...." Conn. Gen. Stat. § 42-133e(b). The statute further "prohibits franchisors from terminating or cancelling a franchise except for good cause and requires franchisors to give the franchisee written notice of such termination [or] cancellation…at least sixty days in advance to such termination with the cause started thereon.." Conn. Gen. Stat. § 42-133f(a). Lastly, the Franchise Act also prohibits "any contractual waiver of a franchisee's statutory protections and overrides any contractual provision to the contrary in a covered franchise agreement." *Stetzer v. Dunkin' Donuts, Inc.*, 87 F. Supp. 2d 104, 113 (D. Conn. 2000).

The Connecticut Supreme Court has concluded that the definition of a franchise "requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." *Getty Petroleum Mktg. v. Ahmad*, 253 Conn. 806, 813 (internal quotation marks and citation omitted) SEE ALSO . *Chem-Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 127 (D.Conn.1993).

Garbinski cites *Charts v. Nationwide Mut. Ins. Co.*, 397 F. Supp. 2d 357 (D. Conn. 2005) *rev'd Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116 (2d Cir.

2008) in support of his argument that the CFA applies to the insurer-agent relationship. In denying Defendants' Motion to Dismiss as to the CFA claim, this Court found that Garbinski had "sufficiently pled that under the Agent Agreement, Garbinski was a 'franchisee' as that term is broadly defined in Conn. Gen. Stat. § 42-133(e)d and that Defendants were 'franchisors' as that term is defined in Conn. Gen. Stat. § 42-133e(c)." [Dkt. #37 at 19]. As this Court previously noted, the issue of whether the CFA applies to the insurer-agent relationship is a matter of first impression before the Court. No Connecticut court has directly addressed whether the Franchise Act applies to an insurance company-insurance agent relationship.

As this Court noted, the Second Circuit reversed the judgment of the district court in *Charts*, and therefore the *Charts* district court "at most suggested that it was plausible that the Franchise Act applied within the insurance context, but did not specially hold it did so. The *Charts* court assumed without specifically deciding that the Franchise Act applied to the facts of the case." [Dkt. #37 at 20]. Nationwide cites *Getty Petroleum Mktg. v. Ahmad*, 253 Conn. 806 to support its argument that the CFA does not apply to the insurer-agent relationship, but that case involved an agreement between a lessor petroleum company and a lessee of a gas station. Accordingly, this Court found that "at the motion to dismiss stage Plaintiff has plausibly pled that the relationship established under the Agent Agreement could state a claim for relief under the Franchise Act." [Dkt. #37 at 24]. The Court further noted that that "whether the nature of the relationship in practice actually met the statutory definition for a franchise under Connecticut

15

law is a question best left for summary judgment or trial after the parties have conducted discovery into the issue as is the larger question of whether the purposes and intent of the Franchise Act should extend to such a relationship."[Dkt. #37 at 24].; *see also Dittman & Greer, Inc. v. Chromalox, Inc.*, No.3:09-cv-1147, 2009 WL 3254481, at *2 (D. Conn. Oct. 6, 2009) (noting that in determining whether a business relationship constituted a franchise the Connecticut Supreme Court set forth several factors to guide the marketing plan analysis and that such analysis "depends not only on the written agreements between the parties *but also their conduct*") (citation omitted) (emphasis added).

The record of this case clearly establishes that an insurance agency in general is not and Garbinski's agency in particular was not a franchise under the meaning of the Connecticut Franchise Act. The parties agree that Garbinski had the right to offer and sell Nationwide products, but Nationwide contends and the record shows that Nationwide did not substantially prescribe a marketing plan for the offering and selling of its products.

First, Garbinski admits that he did not have an exclusive agency relationship with Nationwide and that his agency sold insurance and other financial products on behalf of multiple insurance companies, including Nationwide competitors such as Progressive and The Hartford. [Dkt. # 93-6, Garbinski Dep. at 42-44]. Second, Nationwide did not prescribe the manner in which Garbinski's agency conducted its business.  Garbinski selected the insurance or financial product and he selected the company with which to place his customers' business based on the independent analysis of his customer's

16

needs and the products offered by the various companies for which he wrote business.  Garbinski had an enormous amount of discretion in his sale of insurance products to customers. *See* [Dkt. # 1-4, Agent Agreement, at § 1].  By contrast, relationships protected by the Franchise Act are those in which sales of goods or services must conform to "a marketing plan or system prescribed in substantial part by a franchisor." Conn. Gen. Stat. § 42-133e(b). *See also Rudel Machinery Co., Inc. v. Giddings & Lewis, Inc.*, 68 F.Supp.2d 118 (D.Conn.1999) ("To show that it is 'substantially associated' with the defendant, a plaintiff seeking the protections of the Connecticut Franchise Act (CFA) must show that its business is exclusively, or nearly exclusively, associated with the trademark of the defendant."); *Grand Light and Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 677–78 (2d Cir.1985) ("The purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee.... In the *ordinary franchise situation, typically involving an exclusive relationship*, termination by the franchisor could result in economic disaster for the franchisee. Where the franchisee is completely dependent on the public's confidence in the franchised product for most or all of his business, abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination.") (emphasis added).  Here since Garbinski also sold other insurance products from other insurance companies, he cannot demonstrate that his business is exclusively or nearly exclusively associated with the Nationwide trademark.

By way of example, a substantial difference exists between the typical franchise situation and Garbinski's relationship with Nationwide. In a typical franchise, like a McDonald's or a Dunkin' Donuts, a customer enters the business and orders a donut, coffee, burger, or whatever they care to eat at the moment. A customer does not walk into a McDonald's or a Dunkin' Donuts and explain their specific dietary and nutritional needs to the employees, while the employees offer a recommendation from the menu based on the customer's individual needs. The customer can expect to get only a specific brand of product that the franchisee has bought from the company for resale to the public.  A customer can expect to get a Dunkin' Donuts brand coffee at a Dunkin' Donuts franchise, but the customer cannot buy a Starbucks brand coffee (or anything other than Dunkin' Donuts brand) at a Dunkin' Donuts franchise.

Third, Garbinski did not undertake the risk attendant to a franchise which the act seeks to mitigate.  The nature of Garbinski's agency is quite different. Garbinski, as an insurance agent, offered a variety of insurance products through multiple insurance companies based of the individual insurance needs of each particular client. [Dkt. # 93-6, Garbinski Dep. at 42-44]. Furthermore, unlike in a typical franchise, Garbinski did not buy the insurance products from Nationwide before reselling them to clients, nor was he required to do so or meet any minimum sales quota. Rather, Nationwide owned the policies it issued; Garbinski was a commissioned sales representative and never owned the policies himself. [Dkt. # 93-6 Garbinski Dep. at 116:23—117:17; Agency Administration Handbook, Article 9; Agent Agreement at § 1). Thus, the type of risk undertaken by Garbinski

18

was far different from the risk in a typical franchise arrangement.  Accordingly, this Court finds that the Connecticut Franchise Act did not apply to the insurer-agent relationship that existed between Garbinski and Nationwide. Even if the Franchise Act applied, judgment must enter for the Defendants.

Assuming arguendo that it did apply, here the undisputed facts demonstrate that Nationwide had the required "good cause" to terminate Garbinski's agency under the CFA.  The CFA provides that "[n]o franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for *good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement* ." Conn. Gen. Stat. § 42-133f(a) (emphasis added).  Furthermore, "good cause is not limited to proving contractual breaches of the franchise agreement, but may be based on a franchisor's legitimate business reasons." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1184 (2d Cir. 1995).

Under the CFA, Nationwide had good cause to terminate Garbinski's agency agreement because Garbinski violated a material and reasonable obligation of the agreement and because termination was in Nationwide's legitimate business interests. Section 5 of Garbinski's agency agreement with Nationwide stated as follows: "General Conduct and Representation. *You will maintain a good reputation in the community that you serve* and will direct your efforts in the field of insurance toward advancing the business and interest of the

Companies to the best of your ability." [Dkt. # 1-4 (emphasis added)]. Garbinski also agreed to "conduct [himself] at all times with integrity, dignity, and truthfulness in order to earn recognition as a trusted and valuable advisor" and "comply at all times with the letter and intent of the law." [Dkt. # 78-6, Nationwide Agency Administration Handbook, Section 1; Dkt. # 77, Mem. In support of Defs.' Motion for Summary Judgment at 27].

Through his actions on March 22, 2009, no reasonable jury could find that Garbinski did not violate material and reasonable obligations of his agency agreement and the Agency Administration Handbook. The actions of Garbinski led to a police presence around his Clinton, CT home on March 22, 2009. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶¶ 43-46]. Garbinski was drunk and on methadone, and waved a gun around in the presence of his wife and children. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶¶ 32-43]. Garbinski was arrested and charged with three crimes as a result of his actions. [Dkt. # 90-56, Dkt. # 90-57]. This incident was publicized by several media reports, which identified Garbinski by name. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 56. *See also* Dkt. 93-6, Garbinski Dep. at 51:21-23, 55:-57:16; Dkt. 78-12 at 13 (Hartford Courant Article)]. Nationwide received several complaints and inquiries from customers and individuals regarding the Garbinski incident. [Dkt. # 78, Defs.' Rule 56 Stmt. at ¶ 57. *See also* Dkt. # 78-13, Declaration of Shawn Patterson at ¶ 7; Dkt. # 93-47M (Complaints Received by Nationwide)]. Garbinski agrees that the incident of March 22, 2009 was "not good for [his] public reputation," and that it did not help his public reputation as a Nationwide agent. [Dkt. # 93-6, Garbinski Dep. 65:6—65:9]. The facts as admitted by Garbinski

show that Garbinski was in clear violation of Section 5 of his agency agreement and Section 1 of the Agency Administration Handbook, which constitutes good cause for termination under the CFA.

Garbinski frames the incident of March 22, 2009 as a "personal domestic dispute." [Dkt. # 92 at 21]. He ignores the notoriety of his conduct, its wide publication, his customer's negative reactions and the critical letters Nationwide received from his customers. By all accounts, this incident indeed began as a domestic dispute between Garbinski and his wife over religion. Be that as it may, this dispute soon became a public event when Garbinski's daughter called the police, the police surrounded the Garbinski residence for several hours, Garbinski was arrested, and the incident was published in the news media. In addition, the undisputed fact that several customers and individuals contacted Nationwide to express concern about the incident involving Garbinski indicates that Nationwide certainly had a legitimate business interest in termination of Garbinski's agency agreement.

Garbinski also argues that Nationwide terminated his agency agreement "upon the pretext of the events of March 22, 2009." [Dkt. # 92 at 21]. He claims that the termination was partly motivated by "prejudice against Garbinski for his attempt to compel the Defendants to enforce a non-competition and non-solicitation agreement against a former associate agent of Garbinski." [*Id*.]. According to Garbinski, the email transmissions of Nationwide subsequent to March 22, 2009 indicate that Nationwide was "clearly implementing a plan to get

rid of Garbinski under the pretext of his personal issue." [*Id.* at 21-22]. Garbinski cites to Exhibits 47A-47U and 48-54 of the Plaintiff's Affidavit. [Dkt. # 93]. However, no reasonable jury could conclude on the basis of these emails that Garbinkski's termination was pretextual.  If anything, these emails show that Garbinski's termination was based solely on his notorious conduct on March 22, 2009.  Most of the emails that Garbinski cites are related directly to the events and aftermath of March 22, 2009. Of those few that relate to the "former associate agent" of Garbinski, the only real detail is provided by Garbinski's own email transmissions. The email transmissions of Nationwide relating to the former associate agent provide very little insight into Nationwide's handling of that issue and fail to indicate any sort of "plan" to terminate Garbinski. No reasonable fact finder could draw the conclusion from the email transmissions cited by Garbinski that Nationwide's termination of Garbinski was pretextual or partly motivated by prejudice against Garbinski for attempting to compel Nationwide to enforce a non-compete agreement against a former agent.  Garbinski's argument amounts to nothing more than conjecture and surmise and, as noted earlier, a motion for summary judgment will not be defeated on this basis alone.

The Court likewise disregards Garbinski's allegation that "no meaningful investigation concerning the events of March 22, 2009 was ever conducted by the Defendants based upon the foregoing facts." [Dkt. # 90, Garbinski Affidavit at ¶ 102]. This allegation is mere conjecture and surmise, and Garbinski fails to provide any evidence –beyond his conclusory allegation – that no meaningful investigation was ever conducted by Nationwide.

Here the Franchise Act clearly did not apply to the relationship between Garbinski and Nationwide.  Even if the Franchise Act did apply, no reasonable jury could find that Nationwide did not have good cause to terminate Garbinski's agency agreement under the Franchise Act.  Accordingly, summary judgment is granted as to Plaintiff's Connecticut Franchise Act claim.

### ii.   CUTPA Claim

Garbinski's CUTPA claim [Dkt. # 1-4, Complaint at 10 (Fourth Count)] is contingent on his CFA claim. [Dkt. 92, at 19 ("By terminating Garbinski without 'good cause,' the Defendants violated the Connecticut Unfair Trade Practice Act.")]. Because this Court has granted summary judgment to Nationwide as to the CFA claim, the Court likewise grants summary judgment as to Garbinski's CUTPA claim.

### iii.   Interference with Business Expectancy Claim

Garbinski's Fifth Count in his Complaint alleges that Nationwide "improperly interfered with the relationships of the Plaintiff with its customers and the business expectancy of the Plaintiff to continue to earn premium and/or commission income from said customers upon which the Plaintiff had a right to rely." [Dkt. #1-4, Complaint at 11]. Garbinski claims that Nationwide improperly interfered with Garbinski's relationships with his customers and his business expectancy by "improperly terminating the Agent Agreement and the Securities Agreement, failing to comply with the requirements of Connecticut General Statutes Sections 42-133e through 42-133g and the false reporting of the U-5 form to FINRA." [*Id.*]. Nationwide has moved for summary judgment as to this claim,

arguing that Garbinski's interference with business expectancy claim is contingent on his CFA claim, and that if the Court grants summary judgment on Garbinski's CFA claim then it must also grant summary judgment as to the business expectancy claim. [Dkt. #77 at 23-24].

The elements of a claim for tortious interference with business expectancies are (1) a business relationship between the plaintiff and another party; (2) Defendant's intentional interference with the business relationship while knowing of the relationship; (3) as a result of interference, plaintiff suffered actual loss. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). "A claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself ... Accordingly, the plaintiff must plead and prove at least some improper motive or improper means ... [F]or a plaintiff successfully to prosecute such an action it must prove that ... the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously ... In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification." *Energy Solutions, Inc. v. Realgy, LLC*, 114 Conn.App. 262, 272 (2009) (internal quotation marks and citation omitted). "Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort." *Biro v. Hirsch*, 62 Conn.App. 11, 21 (2001) (internal quotation marks and citation omitted.). Accordingly, "[o]ne could

avoid liability under this tort by not acting maliciously or in bad faith." *Kelly Property Dev., Inc. v. Lebanon*, 226 Conn. 314, 342 (1993).

Garbinski's Interference with Business Expectancy claim is supported solely on the basis of his termination. [Dkt. #1-4, Complaint at 10-11 (Fifth Count)], Like his CUTPA claim, the Court likewise grants summary judgment.  To the extent that Garbinski's business expectancy claim is not contingent upon his CFA claim, the Court also finds no genuine issue of material fact as to this claim because no reasonable jury could find that Nationwide engaged in wrongful conduct as required to establish liability under the tort of interference with business expectancy.  Indeed, Garbinski had no reasonable expectation to continue in his capacity as an insurance agent with Nationwide in light of the conduct he engaged in on March 22, 2009 considering the terms of the Agent Agreement which included a provision for termination at any time with or without cause.  *See* [Dkt. #1-4, Agent Agreement at ¶10].

Garbinski also alleges that Nationwide improperly submitted a U-F form to FINRA alerting FINRA of his arrest.  To the extent that Garbinski's interference with business expectancy claim is predicated on the U-5 Form, Garbinski has also failed to demonstrate that Nationwide acted with an improper motive or means when it submitted the U-5 form.  As a member organization of FINRA, Nationwide had a legal obligation to report when its employee or a FINRA member associated with Nationwide "is arrested" for "any felony." FINRA Rule 351, Reporting Requirements, amended by SR-FINRA-2008-036, eff. Nov. 11, 2008. Nationwide also had a legal obligation to "promptly file with FINRA copies of . . .

any indictment, information or other criminal complaint or plea agreement."
FINRA Rule 4350.  A court document indicates that Garbinski was arrested for a
felony. [Dkt. #56]. Regardless of whether the information provided on the U-5
form was in fact a typographical error as Garbinski claims, no reasonable jury
could conclude that Nationwide submitted the U-5 form with the wrongful
conduct, malice, bad faith, improper motive, or improper means that the tort
requires as there is no evidence that Nationwide had knowledge of the alleged
typographical error prior to submitted the form.  Consequently, the Court grants
summary judgment as to Plaintiff's interference with business expectancy claim.

### iv.    *Breach of Contract Claims*

Garbinski alleges that Nationwide breached the agency agreement and the
Agency Administration Handbook by (1) failure to provide Garbinski a review
board hearing after cancellation of his agency agreement, (2) payment of
extended earnings over a ten-year period rather than a three-year period, (3)
failure to satisfy Garbinski's loans and credit cards with Nationwide bank, and (4)
failure to provide Garbinski the commission statements and tax records that he
requested. Nationwide has moved for summary judgment as to the entire breach
of contract claim.

Under Connecticut law, the elements of a breach of contract action are (1)
the formation of an agreement; (2) performance by one party; (3) breach of the
agreement by the other party; and (4) damages. *Empower Health LLC v.
Providence Health Solutions LLC*, No. 3:10-cv-1163, 2011 WL 2194071, at *4 (D.
Conn. June 3, 2011) (citation omitted). "It is a fundamental principle of contract

law that the existence and terms of a contract are to be determined from the intent of the parties. The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." *Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 225 (2009). "[T]he interpretation and construction of a written contract present only questions of law, within the province of the court ... so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495 (2000) (quoting 11 S. Williston, *Contracts* § 30.6 (4th ed. 1999)). "Contract language is unambiguous when it has a definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion." *Levine v. Advest, Inc.*, 244 Conn. 732, 746 (1998) (internal citations and quotations omitted).

   a. *Review Board Hearing*

   Garbinski's agency contract with Nationwide was at-will. That is, either Garbinski or Nationwide had the right to cancel the agreement at any time, with or without cause. The ICA agreement also provided that Garbinski would have access to the Agent Administrative Review Board and its procedures in the event of termination:

   > This Agreement shall automatically cancel upon the date of your license to act as an agent for the Companies is revoked or cancelled or upon death. Further, due to the personal nature of our relationship, you or the Companies have the right to cancel this Agreement at any time with or without cause after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agent shall

have access to the Agent Administrative Review Board, and its procedures, in accordance with the Companies policies in effect at the time of the agent's request.

[Dkt. # 1-4, § 10]. The Agency Administration Handbook provides the conditions to obtaining a post-cancellation hearing:

To request a Review Board, the agent must submit a written request to his/her Sales Manager, Sales Associate Vice-President, or Sales Administration and Contracts Leadership Team. This request must be made within 5 calendar days after the agent is given written notification of the cancellation.

[Dkt. # 93-5, Nationwide Agency Administration Handbook, § 4].   Nationwide states that it did not receive any writing from Garbinski requesting an agency review board hearing. [Dkt. # 77 at 25]. Garbinski, however, alleges that he did submit a written request for a review board hearing, but that he never received a response from Nationwide and was "constructively denied access" to the review board. [Dkt.# 92 at 6; Dkt. # 93-6, Garbinski Dep. at 74-78]. Garbinski has not produced any evidence showing that he submitted a written request for an agent Review Board hearing aside from his deposition testimony and his affidavit, where he merely alleges that he submitted such a request. [Dkt. # 93-6, Garbinski Dep. at 74:19-78:5; Dkt. # 89, Garbinski Affidavit at ¶104]. Garbinksi has admitted that he does not have a copy of the purported request he sent. [Dkt. # 93-6, Garbinski Dep. at 74:19-75:8].

Here, Garbinski has not established a genuine issue of material fact in light of the fact that he cannot introduce any evidence that he submitted the request within the required five days.  In his Affidavit, Garbinski alleges that the request was submitted "[a]pproximately five days after [Garbinski's] receipt of Exhibit

54,"[2] [Dkt. #91 at 24], with no further evidence to support his allegation that the request was actually made within five days of notice of cancellation.  In his deposition, Garbinski declined to testify that he made the request within five days. [Dkt. # 93-6, Garbinski Dep. at 77:15-79:23]. When asked if he knew whether the letter he allegedly sent to Nationwide requesting a review board was sent within five calendar days of when he was given notification of cancellation, Garbinski responded as follows:

> I don't want to go on record saying I mailed it out within the five days, or it could have been the sixth or seventh day. I don't remember. I just know where I was when I got this news from David Weiss, and that was in Lionville, Pennsylvania.

[Dkt. # 93-6, Garbinski Dep. at 79:19-23]. Garbinski cannot manufacture a genuine issue of material fact merely by claiming that he is not sure whether a fact is true. Mere conclusory allegations cannot defeat an opposing party's motion for summary judgment.  *See, e.g., Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir.1997) ("The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful.") (internal quotations omitted); *Bellsouth Telecomm. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (" '[A]n adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion [for summary judgment] must set forth "concrete particulars." . . . It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts ....." ') (alterations in original).

---

[2] Exhibit 54 is a letter from Frederick Owens to Garbinski dated April 9, 2009, informing Garbinski that his Agent Agreement has been canceled.

Accordingly, this Court grants Summary Judgment as to Garbinski's claim that he was denied an Agent Review Board Hearing.

### b. Payment of Extended Earnings

Garbinski's Complaint alleged that Nationwide also breached the ICA agreement by "fail[ure] to pay the amount of Extended Earnings to the Plaintiff upon any cancellation of the Agent Agreement under Paragraph 12(b) and 12(d)(3) thereof based upon the Plaintiff s most recent payment election which selected a three annual payment method." [Dkt. #1-4, Complaint at 6].

In its motion for summary judgment, Nationwide argues that it is entitled to summary judgment on this claim because Garbinski had elected a ten-year period and not a three-year period as Garbinski alleged in his complaint.  Nationwide offers evidence showing that Garbinski submitted a benefits election form in June 2000 where he chose to have his extended earnings paid out in ten annual payments. [Dkt. #77 at 27]. Nationwide offers further evidence showing that Garbinski submitted a new benefits election form in May 2003 where he made no new election with regard to extended earnings in the case of cancellation. [*Id.*]. Finally, Nationwide asserts that it cannot retroactively change that payout formula because deferred compensation elections cannot be changed upon cancellation under Section 409A of the Internal Revenue Code.

The undisputed facts demonstrate that Garbinski did submit a benefits election form in June 2000, signed by Garbinski and dated June 23, 2000, where he chose to have his extended earnings paid out in ten annual payments. [Dkt. # 78-10]. The evidence also shows that Garbinski submitted a new benefits election

form in May 2003, signed and dated by Garbinski on May 23, 2003, where he made no new election with regard to extended earnings in the case of cancellation. [Dkt. # 78-11]. There is clearly no mark on the form indicating a change in payment option. [*Id.*]. The benefits election forms clearly state that "NO CHANGES ARE PERMITTED ONCE THE AGENT'S AGREEMENT HAS BEEN CANCELED." [Id.]. It appears that Internal Revenue Code § 409A does not allow Nationwide to change Garbinski's benefit payments election in these circumstances. 26 U.S.C. § 409A.  There is no genuine issue of material fact as to Nationwide's payment of extended earnings to Garbinski and as to Garbinski's election of benefit payments.  Consequently, no reasonable jury could find that Nationwide breached the ICA Agreement by failing to pay Garbinski's extended earnings over a three-year period. Nationwide's motion for summary judgment as to the payment of extended earnings claim is therefore granted.

The Court further notes that Garbinski did not respond to Nationwide's motion for summary judgment on the extended earnings claim in his Memorandum in Opposition to Defendants' Motion for Summary Judgment [Dkt. #92], nor in his Local Rule 56(a)(2) Statement. [Dkt. #91]. Since Garbinski has failed to address this claim in his opposition to summary judgment, this Court also deems this claim abandoned. *See e.g., Santiago v. Newburgh Enlarged City School Dist.*, 485 F.Supp.2d 327, 338 (S.D.N.Y.2007) (dismissing the plaintiff's claim that she was fired in retaliation for complaining about discrimination because she failed to respond to the defendant's summary judgment argument); *Coger v. Connecticut*, 309 F.Supp.2d 274, 280 (D.Conn.2004) (noting that the court

can consider a [§ ] 1981 claim abandoned merely because the plaintiff failed to respond to the defendant's argument that summary should be granted in his favor); *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal Courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way"); *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (holding where the defendant's summary judgment motion addresses specific employment discrimination claims, and the plaintiff's opposition papers do not oppose such arguments, court may deem the claims abandoned and grant summary judgment).

### c.  *Automobile Loans and Credit Card Statements*

In his Complaint, Garbinski further alleged that Nationwide breached the ICA Agreement through "fail[ure] to pay the automobile loan and credit card amounts due to the Defendant Insurance companies from the Plaintiff upon the cancellation of the Agent Agreement under Paragraph 12(d) thereof on April 9, 2009 resulting in the accrual of additional interest and the assertion of loan and/or credit card defaults and repossession threats from the Defendant Insurance Companies to the Plaintiff." [Dkt. #1-4, Complaint at ¶6(c)]. In other words, Garbinski appears to claim that the ICA Agreement compels Nationwide to use Garbinski's extended earnings to pay his debts to Nationwide Bank.

Nationwide argues that it is entitled to summary judgment on this claim because it had no contractual obligation to satisfy Garbinski's loans and credit cards with Nationwide Bank, which is a non-party to this action. [Dkt. #77, at 28].

**32**

Nationwide alleges that the ICA Agreement says nothing about this issue and does not compel Nationwide to pay Garbinski's debts to Nationwide Bank from his extended earnings. [*Id.*]. Nationwide cites Sixth Circuit case law featuring a similar situation. *See Nemier v. Nationwide Mut. Ins. Co.*, 458 Fed. Appx. 420, 424 (6th Cir. 2012) (rejecting plaintiff-insurance agent's breach of contract claim that Nationwide had promised to use money it owed to plaintiff upon her retirement to pay off plaintiff's loans immediately rather than in allotments where plaintiff had obtained loan from Nationwide Federal Credit Union, which was not a party to the case).  Nationwide further asserts that Garbinski's argument is "nonsensical," because "[nothing] precluded Garbinski from taking the extended earnings he received from Nationwide and then using those extended earnings to pay his debts to Nationwide Bank." [Dkt. #77, at 28]. Lastly, Nationwide notes that

> Garbinski also cannot show damages. He testified he stopped making payments on the automobile loan more than two years, and that nothing has happened as a result of this. His car was never repossessed and no collection action has ever been instituted against him. (Garbinski Dep. 85:5-17.) So, in reality, he has gotten the free use of a car for the last several years.

[*Id.* at 28 n.15].

Section 12(d) of the ICA Agreement, to which Garbinski refers in Paragraph 6(c) of his Complaint, provides as follows:

> Provisions for Payment
>
> After deducting any amount paid to you under this paragraph for cancellation or termination of any prior Agreement, or as extended renewal service fees under any former agreement, or any amounts due the Companies from you, the Companies will pay to you, or should you not survive, your beneficiary or the estate of your beneficiary: . . .

**[Dkt. #1-4, ICA Agreement at ¶12(d) See also ICA Agreement at § 12(b)6**

**("Extended Earnings will also be reduced by any amount due the Companies.").**

**The section of the ICA Agreement titled "AGENCY APPOINTMENT" defines the**

**parties "collectively referred to in this Agreement as . . . the "Companies" as**

> **Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Assurance Company, Nationwide Insurance Company of Florida, Colonial County Mutual Insurance Company, and Nationwide Lloyds.**

**[*Id.* at 1]. The Court notes that Nationwide Bank is not a party to the ICA**

**Agreement. The Court further notes that Nationwide Bank is not, nor has it ever**

**been, a party to this action.**

**It appears that Garbinski wants his extended earnings to offset the**

**outstanding balance and interest due on his loans.   However, Garbinski points to**

**no authority establishing a right to offset in these circumstances.  Moreover,**

**there was nothing stopping Garbinski from simply paying his loans himself as**

**soon as he received his extended earnings. Because it is clear from the evidence**

**that Nationwide had no contractual obligation to satisfy Garbinski's loans and**

**credit cards with Nationwide Bank, and because no reasonable jury could find**

**otherwise, Nationwide's motion for summary judgment as to the portion of the**

**breach of contract claim dealing with Garbinski's loans and credit cards is hereby**

**granted.  The Court further notes that because Garbinski has not responded to**

**Nationwide's motion for summary judgment as to this claim, this claim is also**

**deemed to have been abandoned by Garbinski.**

### d. Commission Statements and Tax Records

Finally, Garbinski's Complaint alleged that Nationwide breached the ICA Agreement through "fail[ure] to provide the Plaintiff with paycheck information and commission statements when requested by the Plaintiff for the years 2007, 2008, 2009 despite due demand therefor thereby preventing the Plaintiff from being able to comply with his federal and state tax filing obligations and incurring fines and/or penalties related thereto." [*Id.* at ¶6(d)].

Nationwide has moved for summary judgment as to this claim on the grounds that it has now voluntarily provided Garbinski all the commission statements and tax records that he requested, and that Garbinski has now filed his taxes. [Dkt. #77 at 29].  Nationwide notes that Garbinski was already years behind in filing his taxes, even when he was still a Nationwide agent and could still access his commission statements; as of August 4, 2011, Garbinski had not yet filed his 2006 tax return. [*Id.*; *see also* Dkt. # 93-6, Garbinski Dep. at 100:10-25]. Nationwide further asserts that Garbinski admits that the delay occurred because he had not provided his accountant the correct documents and that prior to cancellation, he was not doing anything to acquire the documents. [Dkt. #77 at 29; Dkt. # 93-6, Garbinski Dep. at 100:4-9, 100:16-21.]

Because Nationwide has now provided Garbinski with all commission statements and tax records requested, and because Garbinski does not dispute this fact, there is no genuine issue of material fact as to this portion of Garbinski's breach of contract claim. Because no reasonable jury could find for Garbinski on this issue based on the evidence presented, the Court grants

Nationwide's motion for summary judgment as to this claim. The Court further notes that because Garbinski has failed to respond to Nationwide's argument for summary judgment as to this claim, the Court also deems this claim abandoned by Garbinski.

### Nationwide's Counterclaim

Along with its Answer, Nationwide asserted a Counterclaim against Garbinski. [Dkt. # 40 at 6]. The Counterclaim asserted five counts related to the alleged default on four loans Garbinski had obtained from Nationwide Bank. [*Id.*]. Nationwide seeks judgment in the amount of $290,093.81. [*Id.* at 15]. Nationwide has moved for summary judgment on its Counterclaim. [Dkt. # 77 at 35].

In support of its motion for summary judgment as to the counterclaim, Nationwide submitted a Declaration of Gerald T. McCann, a senior consultant for process management with Nationwide, who has personal knowledge of the loans at issue here. [Dkt. # 78-14]. Nationwide also attached the "Credit Agreement and Promissory Note" and "Security Agreement" for each of these four loans. [*Id. See also* Dkt. # 40-1—Dkt. # 40-8]. In addition to the Declaration, Promissory Notes, and Security Agreements, Nationwide attached documents showing that Garbinski defaulted on each of these loans and that all four loans were transferred from Nationwide Bank to Nationwide. [Dkt. # 78-14 ("Notice of Non-Collectability") ("Absolute Assignment of Loan and Loan Documents")].

The Credit Agreements for each of the four loans provide that "[u]pon termination of Borrower's Agent's Agreement with Nationwide . . . Borrower agrees that this Loan shall be in Default, and the entire amount of the outstanding

Loan balance, plus all accrued interest and other amounts provided for hereunder, shall become immediately due and payable to Payee." [Dkt. # 78-14 at 6, 16-17, 28-29, 42]. The agreements between Nationwide and Nationwide Bank titled "Absolute Assignment of Loan and Loan Documents" provide as follows:

> "Nationwide Bank, for good and valuable consideration, . . . does hereby, to the fullest extent permitted by law, absolutely and without recourse, assign, transfer, and set over unto Nationwide, and Nationwide does absolutely assume from Nationwide Bank, the entire interest of Nationwide Bank now existing or hereinafter acquired in or arising out of or in relation to . . . the above-referenced loan."

[Dkt. # 78-14 at 13-14, 25-26, 38-39, 50-51]. The evidence indicates that the current unpaid balance of the four loans totals $290,093.81. [Dkt. # 78, Declaration of Gerald McCann at ¶ 19]. Nationwide seeks judgment in that amount, plus accrued interest at the contract rate since July 14, 2009. [Dkt. # 77 at 35].

In Garbinski's Answer/Affirmative Defenses to the Counterclaim, Garbinski denied Nationwide's claims for judgment as to the unpaid amounts of the loans. [Dkt. # 43]. In response to Nationwide's statements that the loans were transferred from Nationwide Bank to Nationwide on July 12, 2009, Garbinski responded that he did not have sufficient knowledge or information upon which to form a belief as to those statements, and "therefore leaves the Defendants to their proof." [*Id.* at ¶ 12]. In response to Nationwide's statement quoting language from the Promissory Notes which provided that the loan amounts were due in full and immediately upon termination of the Agent Agreement, Garbinski neither admitted nor denied but "refer[red] the Court to the documents referenced therein and will let the terms of said documents speak for themselves." [Dkt. # 43 at 25].

The Promissory Notes clearly and unequivocally provide that if Garbinski's Agent Agreement with Nationwide is terminated then the "entire amount of the outstanding Loan balance" plus accrued interest "shall become immediately due and payable" to Nationwide Bank. [Dkt. # 78-14 at 6, 16-17, 28-29, 42]. It is also clear that Nationwide Bank transferred the four loans to Nationwide. [Dkt. # 78-14 at 13-14, 25-26, 38-39, 50-51]. Therefore, the entire outstanding loan balance is now immediately due and payable to Nationwide rather than Nationwide Bank.

The Court further notes that Garbinski has not responded to Nationwide's Motion for Summary Judgment as to Nationwide's Counterclaim. Therefore, Garbinski has abandoned any argument as to the Counterclaim.   Because no reasonable jury could find in favor of Garbinski on Nationwide's Counterclaim, and because Garbinski has waived any argument as the Counterclaim, the Court hereby grants Nationwide's motion for summary judgment as to its Counterclaim. Nationwide is entitled to judgment against Garbinski and BMG Insurance in the amount of $290,093.81 plus accrued interest at the contract rate since July 14, 2009.

<u>Conclusion</u>

Based on the foregoing analysis, the Court hereby GRANTS Nationwide's motion for Summary judgment [Dkt. #74] as to all of Garbinski's remaining claims as well as Nationwide's counterclaims.  The Clerk is directed to enter judgment in favor of Defendants and against Garbinski on Plaintiff's claims.  In addition, the Clerk is directed to enter judgment in favor of Defendants and against Garbinksi and BMG Insurance on Defendants' counterclaim in the amount of $290,093.81

plus accrued interest at the contract rate since July 14, 2009.  The Clerk is further

directed to close the case.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: July 24, 2012